UNITED STATES *v.* KARO ET AL.

No. 83–850.  Argued April 25, 1984—Decided July 3, 1984

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN and POWELL, JJ., joined, in Parts I, II, and IV of which REHNQUIST and O'CONNOR, JJ., joined, and in Part III of which BRENNAN, MARSHALL, and STEVENS, JJ., joined. O'CONNOR, J., filed an opinion concurring in part and concurring in the judgment, in which

REHNQUIST, J., joined, *post*, p. 721. STEVENS, J., filed an opinion concurring in part and dissenting in part, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 728.

*Deputy Solicitor General Frey* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Trott, Elliott Schulder,* and *Vincent L. Gambale.*

*Charles Louis Roberts* argued the cause for respondents. With him on the brief for respondents Harley et al. were *Joseph (Sib) Abraham, Jr.,* and *Michael Vigil. Reber Boult, Nancy Hollander,* and *James Beam* filed a brief for respondents Karo et al. *Roger Bargas,* by appointment of the Court, 465 U. S. 1064, filed a brief for respondent Rhodes.*

JUSTICE WHITE delivered the opinion of the Court.

In *United States* v. *Knotts,* 460 U. S. 276 (1983), we held that the warrantless monitoring of an electronic tracking device ("beeper")[1] inside a container of chemicals did not violate the Fourth Amendment when it revealed no information that could not have been obtained through visual surveillance. In this case, we are called upon to address two questions left unresolved in *Knotts:* (1) whether installation of a beeper in a container of chemicals with the consent of the original owner constitutes a search or seizure within the meaning of the Fourth Amendment when the container is delivered to a buyer having no knowledge of the presence of the beeper, and (2) whether monitoring of a beeper falls within the ambit of the Fourth Amendment when it reveals information that could not have been obtained through visual surveillance.

---

*\*Gerald H. Goldstein* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae* urging affirmance.

[1] "A beeper is a radio transmitter, usually battery operated, which emits periodic signals that can be picked up by a radio receiver." *United States* v. *Knotts,* 460 U. S., at 277.

I

In August 1980 Agent Rottinger of the Drug Enforcement Administration (DEA) learned that respondents James Karo, Richard Horton, and William Harley had ordered 50 gallons of ether from Government informant Carl Muehlenweg of Graphic Photo Design in Albuquerque, N. M. Muehlenweg told Rottinger that the ether was to be used to extract cocaine from clothing that had been imported into the United States. The Government obtained a court order authorizing the installation and monitoring of a beeper in one of the cans of ether. With Muehlenweg's consent, agents substituted their own can containing a beeper for one of the cans in the shipment and then had all 10 cans painted to give them a uniform appearance.

On September 20, 1980, agents saw Karo pick up the ether from Muehlenweg. They then followed Karo to his house using visual and beeper surveillance. At one point later that day, agents determined by using the beeper that the ether was still inside the house, but they later determined that it had been moved undetected to Horton's house, where they located it using the beeper. Agent Rottinger could smell the ether from the public sidewalk near Horton's residence. Two days later, agents discovered that the ether had once again been moved, and, using the beeper, they located it at the residence of Horton's father. The next day, the beeper was no longer transmitting from Horton's father's house, and agents traced the beeper to a commercial storage facility.

Because the beeper equipment was not sensitive enough to allow agents to learn precisely which locker the ether was in, agents obtained a subpoena for the records of the storage company and learned that locker 143 had been rented by Horton. Using the beeper, agents confirmed that the ether was indeed in one of the lockers in the row containing locker 143, and using their noses they detected the odor of ether emanating from locker 143. On October 8 agents obtained an order authorizing installation of an entry tone alarm into the door

jamb of the locker so they would be able to tell when the door was opened. While installing the alarm, agents observed that the cans containing ether were still inside. Agents ceased visual and beeper surveillance, relying instead on the entry tone alarm. However, on October 16 Horton retrieved the contents from the locker without sounding the alarm. Agents did not learn of the entry until the manager of the storage facility notified them that Horton had been there.

Using the beeper, agents traced the beeper can to another self-storage facility three days later. Agents detected the smell of ether coming from locker 15 and learned from the manager that Horton and Harley had rented that locker using an alias the same day that the ether had been removed from the first storage facility. The agents obtained an order authorizing the installation of an entry tone alarm in locker 15, but instead of installing that alarm, they obtained consent from the manager of the facility to install a closed-circuit video camera in a locker that had a view of locker 15. On February 6, 1981, agents observed, by means of the video camera, Gene Rhodes and an unidentified woman removing the cans from the locker and loading them onto the rear bed of Horton's pickup truck. Using both visual and beeper surveillance agents tracked the truck to Rhodes' residence where it was parked in the driveway. Agents then observed Rhodes and a woman bringing boxes and other items from inside the house and loading the items into the trunk of an automobile. Agents did not see any cans being transferred from the pickup.

At about 6 p. m. on February 6, the car and the pickup left the driveway and traveled along public highways to Taos. During the trip, the two vehicles were under both physical and electronic surveillance. When the vehicles arrived at a house in Taos rented by Horton, Harley, and Michael Steele, the agents did not maintain tight surveillance for fear of detection. When the vehicles left the Taos residence, agents

determined, using the beeper monitor, that the beeper can was still inside the house. Again on February 7, the beeper revealed that the ether can was still on the premises. At one point, agents noticed that the windows of the house were wide open on a cold windy day, leading them to suspect that the ether was being used. On February 8, the agents applied for and obtained a warrant to search the Taos residence based in part on information derived through use of the beeper. The warrant was executed on February 10, 1981, and Horton, Harley, Steele, and Evan Roth were arrested, and cocaine and laboratory equipment were seized.

Respondents Karo, Horton, Harley, Steele, and Roth were indicted for conspiring to possess cocaine with intent to distribute it and with the underlying offense. 21 U. S. C. §§ 841(a)(1) and 846. Respondent Rhodes was indicted only for conspiracy to possess. The District Court granted respondents' pretrial motion to suppress the evidence seized from the Taos residence on the grounds that the initial warrant to install the beeper was invalid and that the Taos seizure was the tainted fruit of an unauthorized installation and monitoring of that beeper. The United States appealed but did not challenge the invalidation of the initial warrant. The Court of Appeals affirmed, except with respect to Rhodes, holding that a warrant was required to install the beeper in one of the 10 cans of ether and to monitor it in private dwellings and storage lockers. 710 F. 2d 1433 (CA10 1983). The warrant for the search in Taos and the resulting seizure were tainted by the prior illegal conduct of the Government. The evidence was therefore properly suppressed with respect to respondents Horton, Harley, Steele, and Roth, who were held to have protectible interests in the privacy of the Taos dwelling, and with respect to respondent Karo because the beeper had been installed without a warrant and had been monitored while its ether-can host was in his house.[2] We

---

[2] The Court of Appeals reversed as to Rhodes since he had not shown that the beeper had been located in any place in which he had a reasonable

granted the Government's petition for certiorari, 464 U. S. 1068 (1984), which raised the question whether a warrant was required to authorize either the installation of the beeper or its subsequent monitoring. We deal with each contention in turn.

## II

Because the judgment below in favor of Karo rested in major part on the conclusion that the installation violated his Fourth Amendment rights and that any information obtained from monitoring the beeper was tainted by the initial illegality, we must deal with the legality of the warrantless installation. It is clear that the actual placement of the beeper into the can violated no one's Fourth Amendment rights. The can into which the beeper was placed belonged at the time to the DEA, and by no stretch of the imagination could it be said that respondents then had any legitimate expectation of privacy in it. The ether and the original 10 cans, on the other hand, belonged to, and were in the possession of, Muehlenweg, who had given his consent to any invasion of those items that occurred. Thus, even if there had been no substitution of cans and the agents had placed the beeper into one of the original 10 cans, Muehlenweg's consent was sufficient to validate the placement of the beeper in the can. See *United States* v. *Matlock,* 415 U. S. 164 (1974); *Frazier* v. *Cupp,* 394 U. S. 731 (1969).

The Court of Appeals acknowledged that before Karo took control of the ether "the DEA and Muehlenweg presumably could do with the can and ether whatever they liked without violating Karo's rights." 710 F. 2d, at 1438. It did not hold that the actual placement of the beeper into the ether can violated the Fourth Amendment. Instead, it held that the violation occurred at the time the beeper-laden can was transferred to Karo. The court stated:

---

expectation of privacy, nor had he shown any possessory interest in the ether itself that would have been invaded by the installation of the beeper.

712

"All individuals have a legitimate expectation of privacy that objects coming into their rightful ownership do not have electronic devices attached to them, devices that would give law enforcement agents the opportunity to monitor the location of the objects at all times and in every place that the objects are taken, including inside private residences and other areas where the right to be free from warrantless governmental intrusion is unquestioned." *Ibid.*

Not surprisingly, the Court of Appeals did not describe the transfer as either a "search" or a "seizure," for plainly it is neither. A "search" occurs "when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States* v. *Jacobsen*, 466 U. S. 109, 113 (1984). The mere transfer to Karo of a can containing an unmonitored beeper infringed no privacy interest. It conveyed no information that Karo wished to keep private, for it conveyed no information at all. To be sure, it created a *potential* for an invasion of privacy, but we have never held that potential, as opposed to actual, invasions of privacy constitute searches for purposes of the Fourth Amendment. A holding to that effect would mean that a policeman walking down the street carrying a parabolic microphone capable of picking up conversations in nearby homes would be engaging in a search even if the microphone were not turned on. It is the exploitation of technological advances that implicates the Fourth Amendment, not their mere existence.

We likewise do not believe that the transfer of the container constituted a seizure. A "seizure" of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *Ibid.* Although the can may have contained an unknown and unwanted foreign object, it cannot be said that anyone's possessory interest was interfered with in a meaningful way. At most, there was a technical trespass on the space occupied by the beeper. The existence of a physical trespass is only

marginally relevant to the question of whether the Fourth Amendment has been violated, however, for an actual trespass is neither necessary nor sufficient to establish a constitutional violation. Compare *Katz* v. *United States*, 389 U. S. 347 (1967) (no trespass, but Fourth Amendment violation), with *Oliver* v. *United States*, 466 U. S. 170 (1984) (trespass, but no Fourth Amendment violation). Of course, if the presence of a beeper in the can constituted a seizure merely because of its occupation of space, it would follow that the presence of any object, regardless of its nature, would violate the Fourth Amendment.

We conclude that no Fourth Amendment interest of Karo or of any other respondent was infringed by the installation of the beeper. Rather, any impairment of their privacy interests that may have occurred was occasioned by the monitoring of the beeper.[3]

## III

In *United States* v. *Knotts*, 460 U. S. 276 (1983), law enforcement officials, with the consent of the seller, installed a beeper in a 5-gallon can of chloroform and monitored the beeper after delivery of the can to the buyer in Minneapolis, Minn. Although there was partial visual surveillance as the automobile containing the can moved along the public highways, the beeper enabled the officers to locate the can in the area of a cabin near Shell Lake, Wis., and it was this information that provided the basis for the issuance of a search warrant. As the case came to us, the installation of the beeper was not challenged; only the monitoring was at issue. The Court held that since the movements of the automobile and the arrival of the can containing the beeper in the area of the

---

[3] Despite this holding, warrants for the installation and monitoring of a beeper will obviously be desirable since it may be useful, even critical, to monitor the beeper to determine that it is actually located in a place not open to visual surveillance. As will be evident below, such monitoring without a warrant may violate the Fourth Amendment.

cabin could have been observed by the naked eye, no Fourth Amendment violation was committed by monitoring the beeper during the trip to the cabin. In *Knotts*, the record did not show that the beeper was monitored while the can containing it was inside the cabin, and we therefore had no occasion to consider whether a constitutional violation would have occurred had the fact been otherwise.

Here, there is no gainsaying that the beeper was used to locate the ether in a specific house in Taos, N. M., and that that information was in turn used to secure a warrant for the search of the house. The affidavit supporting the application for a search warrant recited that the ether arrived at the residence in a motor vehicle that later departed and that:

> "For fear of detection, we did not maintain tight surveillance of the residence. . . . Using the 'beeper' locator, I positively determined that the 'beeper' can (5-gallon can of ether, described earlier in this affidavit) was now inside the above-described premises to be searched because the 'beeper' locator (direction finder) pinpointed the beeper signal as emanating from the above-described premises. . . . Again, later on Saturday (now in the daytime), 7 February 1981, my 'beeper' locator still shows a strong 'beeper' signal emanating from inside the above-described residence." App. 57–58.

This case thus presents the question whether the monitoring of a beeper in a private residence, a location not open to visual surveillance, violates the Fourth Amendment rights of those who have a justifiable interest in the privacy of the residence. Contrary to the submission of the United States, we think that it does.

At the risk of belaboring the obvious, private residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable. Our cases have not deviated from this basic Fourth Amendment principle. Searches and

seizures inside a home without a warrant are presumptively unreasonable absent exigent circumstances. *Welsh* v. *Wisconsin*, 466 U. S. 740, 748–749 (1984); *Steagald* v. *United States*, 451 U. S. 204, 211–212 (1981); *Payton* v. *New York*, 445 U. S. 573, 586 (1980). In this case, had a DEA agent thought it useful to enter the Taos residence to verify that the ether was actually in the house and had he done so surreptitiously and without a warrant, there is little doubt that he would have engaged in an unreasonable search within the meaning of the Fourth Amendment. For purposes of the Amendment, the result is the same where, without a warrant, the Government surreptitiously employs an electronic device to obtain information that it could not have obtained by observation from outside the curtilage of the house. The beeper tells the agent that a particular article is actually located at a particular time in the private residence and is in the possession of the person or persons whose residence is being watched. Even if visual surveillance has revealed that the article to which the beeper is attached has entered the house, the later monitoring not only verifies the officers' observations but also establishes that the article remains on the premises. Here, for example, the beeper was monitored for a significant period after the arrival of the ether in Taos and before the application for a warrant to search.

The monitoring of an electronic device such as a beeper is, of course, less intrusive than a full-scale search, but it does reveal a critical fact about the interior of the premises that the Government is extremely interested in knowing and that it could not have otherwise obtained without a warrant. The case is thus not like *Knotts*, for there the beeper told the authorities nothing about the interior of Knotts' cabin. The information obtained in *Knotts* was "voluntarily conveyed to anyone who wanted to look . . . ," 460 U. S., at 281; here, as we have said, the monitoring indicated that the beeper was inside the house, a fact that could not have been visually verified.

We cannot accept the Government's contention that it should be completely free from the constraints of the Fourth Amendment to determine by means of an electronic device, without a warrant and without probable cause or reasonable suspicion, whether a particular article—or a person, for that matter—is in an individual's home at a particular time. Indiscriminate monitoring of property that has been withdrawn from public view would present far too serious a threat to privacy interests in the home to escape entirely some sort of Fourth Amendment oversight.[4]

---

[4] JUSTICE O'CONNOR observes that a homeowner has no reasonable expectation that a person invited into his home will not be wired with a microphone that transmits conversations in which he engages, see *United States* v. *White*, 401 U. S. 745 (1971), and from this proposition she concludes that a homeowner has no reasonable expectation that an invitee will not bring an object containing a beeper into his home. *Post*, at 722–724. While that observation would be relevant if one of the conspirators in this case had consented to the placement of the beeper in the can, it has no relevance to the case at hand. Surely if the Government surreptitiously plants a listening device on an unsuspecting household guest or family member and then monitors conversations with the homeowner, the homeowner could challenge the monitoring of the conversations regardless of the fact that he did not have power "to give effective consent to the search" of the visitor. *Post*, at 724. As the plurality recognized in *United States* v. *White, supra*, at 749, there is a substantial distinction between "revelation[s] to the Government by a party to conversations with the defendant" and eavesdropping on conversations without the knowledge or consent of either party to it. A homeowner takes the risk that his guest will cooperate with the Government but not the risk that a trustworthy friend has been bugged by the Government without his knowledge or consent. Under JUSTICE O'CONNOR's view it could easily be said that in *Katz* v. *United States*, 389 U. S. 347 (1967), Katz had no reasonable expectation of privacy in his conversation because the person to whom he was speaking might have divulged the contents of the conversation. There would be nothing left of the Fourth Amendment right to privacy if anything that a *hypothetical* government informant *might* reveal is stripped of constitutional protection.

*Rawlings* v. *Kentucky*, 448 U. S. 98 (1980), is simply inapposite, since it was not Rawlings' home in which the challenged search occurred. Cf. *Alderman* v. *United States*, 394 U. S. 165 (1969) (homeowner has standing to

We also reject the Government's contention that it should be able to monitor beepers in private residences without a warrant if there is the requisite justification in the facts for believing that a crime is being or will be committed and that monitoring the beeper wherever it goes is likely to produce evidence of criminal activity. Warrantless searches are presumptively unreasonable, though the Court has recognized a few limited exceptions to this general rule. See, *e. g.*, *United States* v. *Ross*, 456 U. S. 798 (1982) (automobiles); *Schneckloth* v. *Bustamonte*, 412 U. S. 218 (1973) (consent); *Warden* v. *Hayden*, 387 U. S. 294 (1967) (exigent circumstances). The Government's contention that warrantless beeper searches should be deemed reasonable is based upon its deprecation of the benefits and exaggeration of the difficulties associated with procurement of a warrant. The Government argues that the traditional justifications for the warrant requirement are inapplicable in beeper cases, but to a large extent that argument is based upon the contention, rejected above, that the beeper constitutes only a minuscule intrusion on protected privacy interests. The primary reason for the warrant requirement is to interpose a "neutral and detached magistrate" between the citizen and "the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson* v. *United States*, 333 U. S. 10, 14 (1948). Those suspected of drug offenses are no less entitled to that protection than those suspected of nondrug offenses. Requiring a warrant will have the salutary effect of ensuring that use of beepers is not abused, by imposing upon agents the requirement that they demonstrate in advance their justification for the desired search. This is not to say that there

---

challenge illegal search of house even if he has no interest in the property seized). JUSTICE O'CONNOR seems to recognize as much, noting in the discussion of *Katz, post*, at 725, that "a third person, *who never used a particular telephone line*" would have no standing to challenge illegal eavesdropping. If the phone line is that of the third person, however, a different analysis is involved.

are no exceptions to the warrant rule, because if truly exigent circumstances exist no warrant is required under general Fourth Amendment principles.

If agents are required to obtain warrants prior to monitoring a beeper when it has been withdrawn from public view, the Government argues, for all practical purposes they will be forced to obtain warrants in every case in which they seek to use a beeper, because they have no way of knowing in advance whether the beeper will be transmitting its signals from inside private premises. The argument that a warrant requirement would oblige the Government to obtain warrants in a large number of cases is hardly a compelling argument against the requirement. It is worthy of note that, in any event, this is not a particularly attractive case in which to argue that it is impractical to obtain a warrant, since a warrant was in fact obtained in this case, seemingly on probable cause.

We are also unpersuaded by the argument that a warrant should not be required because of the difficulty in satisfying the particularity requirement of the Fourth Amendment. The Government contends that it would be impossible to describe the "place" to be searched, because the location of the place is precisely what is sought to be discovered through the search. Brief for United States 42. However true that may be, it will still be possible to describe the object into which the beeper is to be placed, the circumstances that led agents to wish to install the beeper, and the length of time for which beeper surveillance is requested. In our view, this information will suffice to permit issuance of a warrant authorizing beeper installation and surveillance.

In sum, we discern no reason for deviating from the general rule that a search of a house should be conducted pursuant to a warrant.[5]

---

[5] The United States insists that if beeper monitoring is deemed a search, a showing of reasonable suspicion rather than probable cause

## IV

As we have said, by maintaining the beeper the agents verified that the ether was actually located in the Taos house and that it remained there while the warrant was sought. This information was obtained without a warrant and would therefore be inadmissible at trial against those with privacy interests in the house—Horton, Harley, Steele, and Roth. That information, which was included in the warrant affidavit, would also invalidate the warrant for the search of the house if it proved to be critical to establishing probable cause for the issuance of the warrant. However, if sufficient untainted evidence was presented in the warrant affidavit to establish probable cause, the warrant was nevertheless valid. *Franks* v. *Delaware*, 438 U. S. 154, 172 (1978).

It requires only a casual examination of the warrant affidavit, which in relevant respects consists of undisputed factual assertions, to conclude that the officers could have secured the warrant without relying on the beeper to locate the ether in the house sought to be searched. The affidavit recounted the months-long tracking of the evidence, including the visual and beeper surveillance of Horton's pickup on its trip from Albuquerque to the immediate vicinity of the Taos residence; its departure a short time later without the ether; its later return to the residence; and the visual observation of the residence with its windows open on a cold night.

That leaves the question whether any part of this additional information contained in the warrant affidavit was itself the fruit of a Fourth Amendment violation to which any of the occupants of the house could object. As far as the

should suffice for its execution. That issue, however, is not before us. The initial warrant was not invalidated for want of probable cause, which plainly existed, but for misleading statements in the affidavit. The Government did not appeal the invalidation of the warrant and as the case has turned out, the Government prevails without a warrant authorizing installation. It will be time enough to resolve the probable cause-reasonable suspicion issue in a case that requires it.

present record reveals, two of the four respondents who had standing to object to the search of the residence—Steele and Roth—had no interest in any of the arguably private places in which the beeper was monitored prior to its arrival in Taos. The evidence seized in the house would be admissible against them.

The question as to Horton and Harley is somewhat more complicated. On the initial leg of its journey, the ether came to rest in Karo's house where it was monitored; it then moved in succession to two other houses, including Horton's, before it was moved first to a locker in one public warehouse and then to a locker in another. Both lockers were rented jointly by Horton and Harley. On September 6, the ether was removed from the second storage facility and transported to Taos.

Assuming for present purposes that prior to its arrival at the second warehouse the beeper was illegally used to locate the ether in a house or other place in which Horton or Harley had a justifiable claim to privacy, we are confident that such use of the beeper does not taint its later use in locating the ether and tracking it to Taos. The movement of the ether from the first warehouse was undetected, but by monitoring the beeper the agents discovered that it had been moved to the second storage facility. No prior monitoring of the beeper contributed to this discovery; using the beeper for this purpose was thus untainted by any possible prior illegality. Furthermore, the beeper informed the agents only that the ether was somewhere in the warehouse; it did not identify the specific locker in which the ether was located. Monitoring the beeper revealed nothing about the contents of the locker that Horton and Harley had rented and hence was not a search of that locker.[6] The locker was identified only

---

[6] Had the monitoring disclosed the presence of the container within a particular locker the result would be otherwise, for surely Horton and Harley had a reasonable expectation of privacy in their own storage locker.

when agents traversing the public parts of the facility found that the smell of ether was coming from a specific locker.

The agents set up visual surveillance of that locker, and on September 6, they observed Rhodes and a female remove the ether and load it into Horton's pickup truck. The truck moved over the public streets and was tracked by beeper to Rhodes' house, where it was temporarily parked. At about 6 p. m. the truck was observed departing and was tracked visually and by beeper to the vicinity of the house in Taos. Because locating the ether in the warehouse was not an illegal search—and because the ether was seen being loaded into Horton's truck, which then traveled the public highways—it is evident that under *Knotts* there was no violation of the Fourth Amendment as to anyone with or without standing to complain about monitoring the beeper while it was located in Horton's truck. Under these circumstances, it is clear that the warrant affidavit, after striking the facts about monitoring the beeper while it was in the Taos residence, contained sufficient untainted information to furnish probable cause for the issuance of the search warrant. The evidence seized in the house should not have been suppressed with respect to any of the respondents.[7]

The judgment of the Court of Appeals is accordingly

*Reversed.*

JUSTICE O'CONNOR, with whom JUSTICE REHNQUIST joins, concurring in part and concurring in the judgment.

I join Parts I, II, and IV of the Court's opinion, and agree with substantial portions of Part III as well.

I agree with the Court that the installation of a beeper in a container with the consent of the container's present owner

---

[7] Although the unwarranted monitoring of the beeper in Karo's house would foreclose using that evidence against him, it did not taint the discovery of the ether in the second warehouse and the ensuing surveillance of the trip to Taos.

implicates no Fourth Amendment concerns. The subsequent transfer of the container, with the unactivated beeper, to one who is unaware of the beeper's presence is also unobjectionable. It is when the beeper is activated to track the movements of the container that privacy interests are implicated.

In my view, however, these privacy interests are unusually narrow—narrower than is suggested by the Court in Part III of its opinion. If the container is moved on the public highways, or in other places where the container's owner has no reasonable expectation that its movements will not be tracked without his consent, activation of the beeper infringes on no reasonable expectation of privacy. *United States* v. *Knotts*, 460 U. S. 276 (1983). In this situation the location of the container defeats any expectation that its movements will not be tracked.

In addition, one who lacks ownership of the container itself or the power to move the container at will, can have no reasonable expectation that the movements of the container will not be tracked by a beeper within the container, regardless of where the container is moved. In this situation the absence of an appropriate interest in the container itself defeats any expectation of privacy in the movements of the container, even when the container is brought into places where others may have a privacy interest. Cf. *Rawlings* v. *Kentucky*, 448 U. S. 98 (1980); *United States* v. *White*, 401 U. S. 745 (1971); *Lopez* v. *United States*, 373 U. S. 427 (1963).

I

As a threshold matter it is clear that the mere presence of electronic equipment inside a home, transmitting information to government agents outside, does not, in and of itself, infringe on legitimate expectations of privacy of all who have an expectation of privacy in the home itself. For example, *United States* v. *White, supra,* permitted the use of information obtained from within a home by means of a microphone secreted on a Government agent. We must therefore look

for something more before concluding that monitoring of a beeper in a closed container that is brought into a home violates the homeowner's reasonable expectations of privacy.

The Court holds that the crucial additional factor is the container owner's consent, or lack of consent, to the installation of the beeper. If consent is given, movement of the container into the home violates no reasonable expectation of privacy of the homeowner. If the container owner's consent is not obtained, the Court holds that the homeowner's expectations of privacy in the home are violated when the beeper enters and is monitored from inside the home, even if the homeowner has no interest or expectation of privacy in the container itself. In my view this analysis is somewhat flawed.

First, the test proposed by the Court seems squarely inconsistent with *Rawlings* v. *Kentucky, supra.* In *Rawlings* this Court approved the admission of drugs seized from a woman's purse because her male companion did not prove that he had a legitimate expectation of privacy in the purse. Indeed, the male companion lacked standing to challenge the search even though he claimed ownership of the drugs found in the purse. Had the purse contained a beeper that for some reason was itself evidence of a crime, only the owner of the purse, not her companion, could have objected to the admission of the beeper itself as evidence. A search of a closed container that occurs without the consent of the container's owner does not give to every defendant a right to suppress incriminating evidence found in the container.

The Court's test for when monitoring a beeper inside a guest's closed and private container violates a homeowner's expectations of privacy is, moreover, difficult to reconcile with *United States* v. *Matlock*, 415 U. S. 164 (1974), and many other similar decisions that address expectations of privacy in closed containers. A homeowner who entirely lacks access to or control over a guest's closed container would presumably lack the power to consent to its search under the standards articulated by this Court in *United States* v.

*Matlock, supra.* But surely a homeowner cannot simultaneously have so little interest in a container that his consent to its search is constitutionally ineffective, and have so great an interest in the container that its search violates his constitutional rights. Standing to object to the search of a container, and power to give effective consent to the search, should go hand in hand.

Finally, and most fundamentally, it is difficult to see how a homeowner's expectations of privacy can depend in any way on an invitee's actual status as a government informant. Expectations are formed on the basis of objective appearances, not on the basis of facts known only to others. Stated another way, the homeowner's expectation that a container does not contain a beeper cannot depend on the container owner's belief that the container is beeper-free. The homeowner's expectation of privacy is either inherently reasonable or it is inherently unreasonable. A guest's undisclosed status as a government informant cannot alter the reasonableness of that expectation.

## II

I would, therefore, use a different and generally narrower test than the one proposed by the Court for determining when an activated beeper in a closed container violates the privacy of a homeowner into whose home the container is moved. I would use as the touchstone the defendant's interest in the container in which the beeper is placed. When a closed container is moved by permission into a home, the homeowner and others with an expectation of privacy in the home itself surrender any expectation of privacy they might otherwise retain in the movements of the container—unless it is *their* container or under *their* dominion and control.[1]

---

[1] If a container is moved into a home *without* permission, the homeowner of course retains a legitimate expectation that the container will not enter into his home, and *a fortiori* a legitimate expectation that knowledge of the

My reasons for preferring this approach require some elaboration. The principles for assessing a single person's privacy interests in a particular place, location, or transmission system such as a telephone line, are reasonably well settled. The Court relies on these principles—particularly on the strong presumption of privacy in the home—to analyze the beeper case presented here. But the movement of a guest's closed container into another's home involves overlapping privacy interests. When privacy interests in particular locations are shared by several persons, assessing expectations of privacy requires a more probing analysis.

A privacy interest in a home itself need not be coextensive with a privacy interest in the contents or movements of everything situated inside the home. This has been recognized before in connection with third-party consent to searches. A homeowner's consent to a search of the home may not be effective consent to a search of a closed object inside the home. Consent to search a container or a place is effective only when given by one with "common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States* v. *Matlock*, 415 U. S., at 171. "Common authority . . . rests . . . on mutual use of the property by persons generally having joint access or control for most purposes . . . ." *Id.*, at 171, n. 7.

When a person has no privacy interest whatsoever in a particular container, place, or conversation, as in *Rawlings* v. *Kentucky*, 448 U. S. 98 (1980), Fourth Amendment analysis is straightforward—the person lacks standing to suppress the evidence obtained pursuant to an unlawful search of the place, or unlawful monitoring of the conversation. Thus, a third person, who never used a particular telephone line, could not suppress, at least on Fourth Amendment grounds,

---

container's location inside his home will not be broadcast to the world outside.

evidence obtained by an unlawful wiretap of conversations between two other persons.[2]

Another relatively easy case arises when two persons share identical, overlapping privacy interests in a particular place, container, or conversation. Here *both* share the power to surrender each other's privacy to a third party. Persons who share access to closed containers also share the power to consent to a search; only if neither consents do both retain the right to object to the fruits of an unlawful search. Similarly, two people who speak face to face in a private place or on a private telephone line both may share an expectation that the conversation will remain private, *Katz* v. *United States*, 389 U. S. 347 (1967), but either may give effective consent to a wiretap or other electronic surveillance, *United States* v. *White*, 401 U. S. 745 (1971). One might say that the telephone line, or simply the space that separates two persons in conversation, is their jointly owned "container." Each has standing to challenge the use as evidence of the fruits of an unauthorized search of that "container," but either may also give effective consent to the search.

A more difficult case arises when one person's privacy interests fall *within* another's, as when a guest in a private home has a private container to which the homeowner has no right of access. The homeowner who permits entry into his home of such a container effectively surrenders a segment of the privacy of his home to the privacy of the owner of the container. Insofar as it may be possible to search the container without searching the home, the homeowner suffers no invasion of *his* privacy when such a search occurs; the homeowner also lacks the power to give effective consent to the search of the closed container. For example, evidence obtained from an electronic device in the container that transmitted information only about the *contents* of the container could not be suppressed by the homeowner unless he also had a privacy

---

[2] But see 18 U. S. C. § 2515 (broader standing rules to suppress wiretap evidence set by statute).

interest in the container, even if the information were transmitted from inside the home.

The beeper in this case, however, transmitted information about the *location*, not the contents, of the container. Conceivably, location in a home is an attribute partly of the home and partly of the container itself. But the primary privacy interest is not the homeowner's. By giving consent to another to move a closed container into and out of the home the homeowner has effectively surrendered his privacy insofar as the location of the container may be concerned, or so we should assume absent evidence to the contrary. In other words, one who lacks dominion and control over the object's location has no privacy interest invaded when that information is disclosed. It is simply not *his* secret that the beeper is disclosing, just as it is not *his* privacy that would be invaded by a search of the container whose contents he did not control.

### III

In sum, a privacy interest in the location of a closed container that enters a home with the homeowner's permission cannot be inferred mechanically by reference to the more general privacy interests in the home itself. The homeowner's privacy interests are often narrower than those of the owner of the container. A defendant should be allowed to challenge evidence obtained by monitoring a beeper installed in a closed container only if (1) the beeper was monitored when visual tracking of the container was not possible, so that the defendant had a reasonable expectation that the container's movements would remain private, and (2) the defendant had an interest in the container itself sufficient to empower him to give effective consent to a search of the container. A person's right not to have a container tracked by means of a beeper depends both on his power to prevent visual observation of the container and on his power to control its location, a power that can usually be inferred from a privacy interest in the container itself. One who lacks either

power has no legitimate expectation of privacy in the movements of the container.

For the reasons stated in Part IV of JUSTICE WHITE's opinion, I agree that the decision below must be reversed.

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, concurring in part and dissenting in part.

The beeper is a species of radio transmitter. Mounted inside a container, it has much in common with a microphone mounted on a person. It reveals the location of the item to which it is attached—the functional equivalent of a radio transmission saying "Now I am at ——."

The threshold question in this case is whether the beeper invaded any interest protected by the Fourth Amendment. As we wrote earlier this Term, the Fourth Amendment

> "protects two kinds of expectations, one involving 'searches,' the other 'seizures.' A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States* v. *Jacobsen,* 466 U. S. 109, 113 (1984) (footnotes omitted).

In my opinion the surreptitious use of a radio transmitter—whether it contains a microphone or merely a signalling device—on an individual's personal property is both a seizure and a search within the meaning of the Fourth Amendment. Part III of the opinion of the Court correctly concludes that when beeper surveillance reveals the location of property that has been concealed from public view, it constitutes a "search" within the meaning of the Fourth Amendment. I join Part III on that understanding. However, I find it necessary to write separately because I believe the Fourth Amendment's reach is somewhat broader than that which is explicitly acknowledged by the Court, and in particular

because my understanding of the Fourth Amendment, as well as my understanding of the issues that have been framed for us by the parties to this case, leads me to a different result than that reached by the Court.

## I

The attachment of the beeper, in my judgment, constituted a "seizure."[1]  The owner of property, of course, has a right to exclude from it all the world, including the Government, and a concomitant right to use it exclusively for his own purposes.  When the Government attaches an electronic monitoring device to that property, it infringes that exclusionary right; in a fundamental sense it has converted the property to its own use.  Surely such an invasion is an "interference" with possessory rights; the right to exclude, which attached as soon as the can respondents purchased was delivered, had been infringed.[2]  That interference is also "meaningful"; the character of the property is profoundly different when infected with an electronic bug than when it is entirely germ free.

The impact on possessory rights of this type of governmental conduct is illustrated by *Silverman* v. *United States*, 365 U. S. 505 (1961).  There the Court held that the attachment of a microphone to the heating duct of an apartment building in order to eavesdrop on conversations in a nearby apartment implicated the Fourth Amendment:

---

[1] The seizure issue was not decided in *United States* v. *Knotts*, 460 U. S. 276 (1983); there Knotts did not challenge the installation of the beeper or its impact on his possessory rights.  See *id.*, at 279, n.; see also *id.*, at 286 (BRENNAN, J., concurring in judgment); *id.*, at 288 (STEVENS, J., concurring in judgment).

[2] It makes no difference in this case that when the beeper was initially attached, the can had not yet been delivered to respondents.  Once the delivery had been effected, the container was respondents' property from which they had the right to exclude all the world.  It was at that point that the infringement of this constitutionally protected interest began.

> "[T]he officers overheard the petitioners' conversations only by usurping part of the petitioners' house or office— a heating system which was an integral part of the premises occupied by the petitioners, a usurpation that was effected without their knowledge and without their consent.  In these circumstances we need not pause to consider whether or not there was a technical trespass under the local property law relating to party walls.  Inherent Fourth Amendment rights are not inevitably measurable in terms of ancient niceties of tort or real property law."  *Id.*, at 511 (footnote omitted).

Here too, by attaching a monitoring device to respondents' property, the agents usurped a part of a citizen's property— in this case a part of respondents' exclusionary rights in their tangible personal property.  By attaching the beeper and using the container to conceal it, the Government in the most fundamental sense was asserting "dominion and control" over the property—the power to use the property for its own purposes.  And "assert[ing] dominion and control" is a "seizure" in the most basic sense of the term.  See *Jacobsen*, 466 U. S., at 120.[3]

## II

The Court has developed a relatively straightforward test for determining what expectations of privacy are protected by the Fourth Amendment with respect to the possession of personal property.  If personal property is in the plain view of the public, the possession of the property is in no sense "private" and hence is unprotected: "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."  *Katz* v.

---

[3] It follows that those with possessory interests in the can to which the beeper was attached have standing to challenge the seizure and that the "seizure" tainted all of the beeper surveillance in this case.

*United States*, 389 U. S. 347, 351 (1967).[4]    When a person's property is concealed from public view, however, then the fact of his possession is private and the subject of Fourth Amendment protection.

> "One point on which the Court was in virtually unanimous agreement in *Robbins* [v. *California*, 453 U. S. 420 (1981)] was that a constitutional distinction between 'worthy' and 'unworthy' containers would be improper. . . . [T]he central purpose of the Fourth Amendment forecloses such a distinction.    For just as the most frail cottage in the kingdom is absolutely entitled to the same guarantees of privacy as the most majestic mansion, so also may a traveler who carries a toothbrush and a few articles of clothing in a paper bag or knotted scarf claim an equal right to conceal his possessions from official inspection as the sophisticated executive with the locked attaché case." *United States* v. *Ross*, 456 U. S. 798, 822 (1982).

Thus, "the Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view." *Id.*, at 822–823.[5]

*United States* v. *Knotts*, 460 U. S. 276 (1983), illustrates this approach.    There, agents watched as a container of chloroform in which they had placed a beeper was delivered to Knotts' codefendant and placed in his car.    They then used the beeper to track the car's movements on a single trip

---

[4] See *Smith* v. *Maryland*, 442 U. S. 735, 744–746 (1979); *United States* v. *Miller*, 425 U. S. 435, 442 (1976); *United States* v. *Dionisio*, 410 U. S. 1, 14 (1973).

[5] See *United States* v. *Jacobsen*, 466 U. S. 109, 129 (1984) (WHITE, J., concurring in part and concurring in judgment); *Illinois* v. *Andreas*, 463 U. S. 765, 768, 771 (1983); *Robbins* v. *California*, 453 U. S. 420, 426–427 (1981) (plurality opinion); *Arkansas* v. *Sanders*, 442 U. S. 753, 764–765 (1979); *United States* v. *Chadwick*, 433 U. S. 1, 13, and n. 8 (1977).    See also *Jacobsen*, 466 U. S., at 120, n. 17.

through a public place. Used in this way the beeper did not disclose that the codefendant was in possession of the property; the agents already knew that. It revealed only the route of a trip through areas open to the public, something that was hardly concealed from public view. The Court held: "A person traveling in an automobile on public throroughfares has no reasonable expectation of privacy in his movements from one place to another." *Id.*, at 281.[6]

It is certainly true that a homeowner has a reasonable expectation of privacy in the contents of his home, including items owned by others. *Alderman* v. *United States*, 394 U. S. 165, 176–177 (1969).[7] But focusing on the interest of

---

[6] The Court was careful to note that the beeper had not revealed anything that was not exposed to public view: "A police car following Petschen at a distance throughout his journey could have observed him leaving the public highway and arriving at the cabin owned by respondent, with the drum of chloroform still in the car. This fact, along with others, was used by the government in obtaining a search warrant which led to the discovery of the clandestine drug laboratory. But there is no indication that the beeper was used in any way to reveal information as to the movement of the drum within the cabin, or in any way that would not have been visible to the naked eye from outside the cabin." 460 U. S., at 285. See also *ante*, at 713–714.

[7] I agree with the Court's response, *ante*, at 716–717, n. 4, to JUSTICE O'CONNOR's position, which I take to be that when the homeowner has no power to check the inside of a container for the presence of a beeper, he must always assume the risk that his guests will carry with them items that are being electronically monitored. Moreover, I do not believe that electronic surveillance has become or ever should be permitted to become so pervasive that homeowners must expect that containers brought into their homes are infested with electronic bugs. While *Rawlings* v. *Kentucky*, 448 U. S. 98 (1980), establishes that one may not have a reasonable expectation of privacy in the contents of a container in the possession of another, the search in that case did not occur in Rawlings' home, see *id.*, at 100–101, and hence sheds no light on the Fourth Amendment rights of the homeowner. Those rights are defined in *Alderman*, where we concluded that the homeowner may object to police conduct that reveals what has gone on in his home irrespective of whether he has any expectation of privacy in the effects that have been searched and seized: "If the police make an unwarranted search of a house and seize tangible property belonging to

the homeowner should not obscure the independent interest of those in possession of property that is monitored through the use of a beeper while the property is in a home or in any other location in which it is concealed from public view.

In this case, the beeper enabled the agents to learn facts that were not exposed to public view. In *Knotts* the agents already saw the codefendant take possession of chloroform, and therefore the beeper accomplished no more than following the codefendant without the aid of the beeper would have. Here, once the container went into Karo's house, the agents thereafter learned who had the container and where it was only through use of the beeper. The beeper alone told them when the container was taken into private residences and storage areas, and when it was transported from one place to another.

The Court recognizes that concealment of personal property from public view gives rise to Fourth Amendment protection when it writes: "Indiscriminate monitoring of property that has been withdrawn from public view would present far too serious a threat to privacy interests in the home to escape entirely some sort of Fourth Amendment oversight." *Ante*, at 716 (footnote omitted). This protection is not limited to times when the beeper was in a home.[8]

third parties—even a transcript of a third-party conversation—the homeowner may object to its use against him, not because he had any interest in the seized items as 'effects' protected by the Fourth Amendment, but because they were the fruits of an unauthorized search of his house, which is itself expressly protected by the Fourth Amendment." 394 U. S., at 176–177 (footnote omitted).

[8] The Court seems to acknowledge as much, since it indicates that the location of property can be private even when not in a home. See *ante*, at 720, n. 6. And even if it is assumed that a beeper infringes privacy interests only with respect to the location of items concealed within a home, the "search" that the Court concludes began when the can containing the beeper went into Karo's home did not end when it left the home. When the agents monitored the beeper at a later point and learned that the can was no longer in the home, the invasion of the privacy of Karo's home continued; by learning that the can was no longer in the home the monitoring

734

The beeper also revealed when the can of ether had been moved. When a person drives down a public thoroughfare in a car with a can of ether concealed in the trunk, he is not exposing to public view the fact that he is in possession of a can of ether; the can is still "withdrawn from public view" and hence its location is entitled to constitutional protection. If a footlocker, see *United States* v. *Chadwick*, 433 U. S. 1 (1977), or even a "knotted scarf," entitles the owner of property to conceal its location from official inspection, then surely placing it in a car suffices as well.[9]   In this case it was only the beeper that enabled the agents to discover where the can was once it had been concealed in Karo's house.   At no point thereafter did the District Court find or does the Government contend that the location of the can was exposed to public view; the agents did not know when it was moved and hence would not have been able to follow its route without the aid of the beeper.   Moreover, here the agents could not have employed visual surveillance to determine when the can was moved for fear of detection.   *Ante,* at 714.   Because the beeper enabled them to learn the location of personal

---

told the agents something they otherwise would not have known about what was in Karo's home.   If monitoring of a beeper constitutes a search because it "establishes that the article remains on the premises," *ante,* at 715, it is no less a search when it establishes that the article has *left the premises.*   For this reason, the Court's holding in Part IV of its opinion that any violation of respondents' privacy rights before the can left the second warehouse did not taint its later monitoring is flawed.   The later monitoring necessarily told police that the container had left areas the Court considers protected, and therefore itself violated privacy rights.

[9] It follows that I believe JUSTICE O'CONNOR's criteria are sufficient to accord an accused standing to challenge beeper surveillance—if that person had the power to prevent visual surveillance of the container and hence a reasonable expectation that the location of the property would remain private, he can challenge beeper surveillance of the container.   *Ante,* at 727–728.   Since it is the location of the property that is concealed from public view and hence private, those who have concealed the items are the persons whose privacy has been invaded, if the property was concealed in a place where they could reasonably expect its location would remain private.   See *United States* v. *Salvucci*, 448 U. S. 83, 91–93 (1980).

property not exposed to public view, it invaded an interest embraced in the Fourth Amendment's conception of a "search."

This "search" began at the moment Karo brought the can into his house and hence concealed it from public view. As a general matter, the private citizen is entitled to assume, and in fact does assume, that his possessions are not infected with concealed electronic devices. The concealment of such items on personal property significantly compromises the owner's interest in privacy, by making it impossible to conceal that item's possession and location from the Government, despite the fact that the Fourth Amendment protects the privacy interest in the location of personal property not exposed to public view. I find little comfort in the Court's notion that no invasion of privacy occurs until a listener obtains some significant information by use of the device. *Ante*, at 712. The expectation of privacy should be measured from the standpoint of the citizen whose privacy is at stake, not of the Government. It is compromised the moment the invasion occurs. A bathtub is a less private area when the plumber is present even if his back is turned.[10]

The agents did not know who was in possession of the property or where it was once it entered Karo's house. From that moment on it was concealed from view. Because the beeper enabled the agents to learn the location of property otherwise concealed from public view, it infringed a privacy interest protected by the Fourth Amendment.[11]

---

[10] The Court states: "The mere transfer to Karo of a can containing an unmonitored beeper infringed no privacy interest." *Ante*, at 712. Presumably the Court would also conclude that no privacy interest would be infringed by the entrance of a blindfolded plumber.

[11] It follows that I disagree with the Court's conclusion that the monitoring of the beeper that revealed it was in the second warehouse did not constitute a search. *Ante*, at 720–721. The property was concealed from public view; its location was a secret and hence by revealing its location the beeper infringed an expectation of privacy. Without the beeper, the agents would have never found the warehouse, and hence would have never set up visual surveillance of the locker containing the can of ether.

## III

The impact of beeper surveillance upon interests protected by the Fourth Amendment leads me to what I regard as the perfectly sensible conclusion that absent exigent circumstances Government agents have a constitutional duty to obtain a warrant before they install an electronic device on a private citizen's property.

Because the Government does not challenge the conclusion that the warrant purporting to authorize the installation of the beeper was obtained improperly, I would affirm the judgment of the Court of Appeals. I would not engage in a *de novo* examination of the record in an effort to determine whether there is sufficient information independent of that obtained by means of the beeper to support the issuance of the warrant to search the Taos house. That question was not raised in the petition for certiorari and has not been briefed by the parties.[12] Surely this is an inquiry that should be made in the first instance by the trial court after the parties have had an opportunity to argue the issue.

Accordingly, I respectfully dissent.

---

[12] The questions presented in the petition for certiorari are:

"1. Whether warrantless installation of a beeper inside a container of chemicals with the consent of the original owner violates the Fourth Amendment rights of a suspect in a drug manufacturing scheme to whom the container is subsequently transferred.

"2. Whether the warrantless monitoring of signals from a beeper installed inside a container of chemicals that law enforcement authorities reasonably believe will be used to manufacture illegal drugs violates the Fourth Amendment when the monitoring occurs while the beeper is located within a home or other 'private' area (such as a commercial storage locker)." Pet. for Cert. I.

I fail to see how the discussion in Part IV of the opinion of the Court addresses either of these questions. To the contrary, it appears that the Court has concluded that the Court of Appeals answered both of these questions correctly even as it reverses the judgment.