**In the Matter of the APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING THE INSTALLATION AND USE OF A PEN REGISTER and/or Trap and Trace for Mobile Identification Number (585) 111–1111 and the Disclosure of Subscriber and Activity Information under 18 U.S.C. § 2703**

**No. 06–MJ–506.**

United States District Court, W.D. New York.

Feb. 15, 2006.

Martin J. Littlefield, U.S. Attorney's Office, Buffalo, NY, Robert Marangola, U.S. Attorney's Office, Rochester, NY, for Plaintiff.

Rodney O. Personius, Personius Melber LLP, Buffalo, NY, for Defendant.

## AMENDED DECISION AND ORDER

FELDMAN, United States Magistrate Judge.

### *Relevant Factual and Procedural Background*

Before the Court is the government's application for an order authorizing a tele-

communication service provider (TSP) to disclose to federal law enforcement agents cell site tower location information (hereinafter "cell site data") at the inception and termination of a call made and received by an identified cellular telephone. While the cell site data is admittedly sought by law enforcement to monitor the "general location of that cellphone (at the beginning and the end of the call) in relation to a cellphone tower," the government represents that the specific data sought in the instant application will not reveal "an exact location for a phone, only a general vicinity." *See* Government Memorandum in Support of its Application for an Order to Obtain Cell Site Location Information (hereinafter "Government Memorandum") at page 2 and note 3. (Docket # 4). The government asserts that non-historical or "real time" cell location data should be provided to law enforcement upon a factual showing to a judicial officer that reasonable grounds exist to believe that the cell location information being sought is relevant and material to an ongoing criminal investigation. *See* 18 U.S.C. § 2703(d).

In the last several months at least seven Magistrate Judges have considered applications for cell site data and issued comprehensive written decisions. Five courts rejected the government's request for prospective or real time cell site data. *In re Application for Pen Register and Trap/Trace Device with Cell Site Location Authority*, 396 F.Supp.2d 747 (S.D.Tex.2005); *In the Matter of an Application of the United States for an Order (1) Authorizing the Use of a Pen Register and a Trap and Trace Device and (2) Authorizing Release of Subscriber Information and/or Cell Site Information*, 396 F.Supp.2d 294 (E.D.N.Y.2005); *In re Application of the United States for an Order Authorizing the Installation and Use of a Pen Register and a Caller Identification System on Telephone Numbers (Sealed) and the Production of Real Time Cell Site Information*, 2005 WL 3160860 (D.Md. Nov.29, 2005); *In re Matter of the Application of the United States of America for an Order Authorizing the Release of Prospective Cell Site Information*, 2006 WL 41229 (D.D.C. Jan.6, 2006) and *In the Matter of the Application of the United States of America for an Order Authorizing the Disclosure of Prospective Cell Site Information*, 2006 WL 243017 (E.D.Wis. Jan. 17, 2006). Two courts have determined that the statutory scheme relied on by the government can appropriately authorize disclosure of prospective cell site data. *In re Application of the United States of America for an Order for Disclosure of Telecommunications Records and Authorizing the Use of a Pen Register and Trap and Trace*, 2005 WL 3471754 (S.D.N.Y. Dec.20, 2005) and *In the Matter of the Application of the United States for an Order Authorizing the Installation and Use of a Pen Register and Trap and Trace Device and Authorizing Release of Subscriber Information and/or Cell Site Information*, 2006 WL 244270 (W.D.La. Jan.26, 2006).

The government's application here was, of course, initially submitted to the court to review *ex parte*. In light of the conflicting decisions and, after consultation with and the consent of the government, the court appointed counsel [1] to represent the unnamed cell phone user whose statutory and constitutional rights may be implicated by the production of their cell site data on a real time basis. Expedited briefing was completed and a hearing on the govern-

---

**1.** The Court expresses its appreciation to CJA Panel Attorneys Rodney O. Personius, Esq. and Brian M. Melber, Esq. for their willingness to accept the assignment and comprehensively brief the legal issues presented on an expedited basis.

ment's application was held on February 1, 2006.[2]

The previous judicial decisions issued by my Magistrate Judge colleagues, while differing in determinations, include careful and comprehensive discussions about not only the specific statutes at issue and their legislative history, but also elaborate on cellular telephone technology generally and the ability to use cell site data and/or global positioning systems (GPS) to determine the location of a particular cell phone. For purposes of this expedited decision, the Court will not recapitulate those analyses except as necessary to support this opinion. However, familiarity with those elucidative discussions on the statutes involved, their legislative history and cellular technology is assumed here.

### The Government's Position

The government's argument in support of obtaining "real time" cell site information is two pronged. First, the government asserts that because the data requested in the specific application before this Court could not reveal anything more than the "general location" of the cell phone user, a judicial determination of probable cause is not required for their application to be granted. The government argues that even "if a cellphone is deemed to be in the nature of a tracking device, there is no Fourth Amendment requirement that a search warrant be ob-

tained when the 'location' information is of a very general nature." *See* Government Memorandum at page 25. During the hearing appointed counsel essentially agreed that, assuming the government's representation is accurate and the information sought in the instant application can only provide law enforcement with "general location" information,[3] a judicial determination of probable cause is not *constitutionally* required.

Appointed counsel does, however, challenge the second prong of the government's argument. Specifically, appointed counsel questions the statutory authority for this Court to grant the government's application for non-historical cell site data. The government contends that this Court is specifically authorized to require the TSP to provide cell site location information to law enforcement agents on a "real time" basis pursuant to a combination of 18 U.S.C. §§ 3122, 3123 (The Pen Register and Trap and Trace Statute (the Pen Statute)), 47 U.S.C. § 1002(a)(2) (The Communications Assistance for Law Enforcement Act of 1994 (CALEA)) and 18 U.S.C. § 2703(c) and (d) (The Electronic Communications Privacy Act (ECPA), including Title II, the Stored Communications Act (SCA)). The government asserts that Congress specifically intended for judicial officers to combine various provisions of these statutes in determining whether to authorize the disclosure of cell site data to

---

**2.** With the consent of the government, a "fictional" version of the government's application was prepared by the government, publicly filed with the Clerk of the Court and provided to appointed counsel. The legal issues presented by the publicly filed application are, however, identical to the issues presented in the actual application that was submitted to the Court *ex parte.*

**3.** The Court relies on the government's representation that it is only seeking the general location information that could be gleaned

from a single cell tower as well as a letter from Verizon's Court Order Compliance Manager which states that the information sought will only *"identify the general area that the target mobile phone number is located at the time of a specific call"* and that it *"cannot pinpoint the exact location of the mobile phone."* *See* Government's Memorandum, Exhibit B. Indeed, Verizon states that its ability to provide a cell phone's location *"can range from several hundred meters to several miles." Id.*

law enforcement. According to the government, "these three statutes converge to authorize a court to issue a prospective order allowing law enforcement to obtain" cell tower location information on a real time basis. *See* Government Memorandum at page 21. The government's brief synopsizes their "convergence" argument well:

> In summary, the Pen Statute allows the issuance of a prospective order authorizing law enforcement to obtain from cellphone use a range of non-content information which includes numbers dialed and received and signaling information related to the use of the cellphone. CALEA recognizes and authorizes that the release of Cell Site Location Information may be obtained through a court order, but limits the ability of law enforcement to get cell site location information "solely pursuant" to an order under the Pen Statute. ECPA authorizes law enforcement to obtain cell site location information, but only if the applicant establishes "specific and articulable facts showing that there are reasonable grounds to believe that the … records or other information sought are relevant and material to an ongoing criminal investigation'—a much higher standard than allowed under the Pen Statute. Accordingly, these three statutes converge to authorize a court to issue a prospective order allowing law enforcement to obtain [general location information]."

*See* Government Memorandum at page 20–21. (emphasis in original).

### *Discussion*

I begin by stating that I find much of the government's statutory interpretation and analysis to be correct. Specifically: (1) cell site location data is encompassed by the term "signaling information" when that term was added to the Pen Statute by Congress in 2001 as part of the Patriot Act; (2) the Pen Statute authorizes cell site location data to be *captured* by the pen register device based upon the government's certification pursuant to 18 U.S.C. § 3122(b)(2) that the "information likely to be obtained is relevant to an ongoing criminal investigation"; (3) the SCA authorizes the government to obtain *historical* cell site data, including location information, upon a showing that "there are reasonable grounds to believe" that the historical data sought is "relevant and material to an ongoing criminal investigation" pursuant to 18 U.S.C. § 2703(d); and (4) CALEA forbids law enforcement from obtaining the data and information the government seeks here based on the "likely to be relevant" standard found in the Pen Statute. Where I part with the government's analysis is their assertion that a judicial officer should be able to extrapolate from these separate and independent statutory enactments and limitations the lawful authority to allow law enforcement to use a pen register device to obtain real time cell location data, at least on anything less than a showing of probable cause.

There are several reasons I find the government's "convergence" argument unconvincing. I start with the proposition that it simply is not found in the plain language of any of the three statutes upon which the government relies. If the first rule of statutory interpretation is to "start, as always, with the language of the statute" (*Williams v. Taylor*, 529 U.S. 420, 431, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000)), there is nothing in the express language of the Pen Statute, CALEA or ECPA which instructs judges to follow the particular convergence theory the government suggests. One would assume that if Congress wanted judges to grant the disclosure of real time cell site data by importing the procedural rules and safe-

guards of a statute that Congress directed *not* be used to authorize the disclosure of prospective cell site location data (the Pen Register statute) into a statute and under a standard that Congress specifically reserved for the production of *historical* telephone records (the SCA), ·Congress could have and would have clearly said so. Congress did not. "The familiar 'easy-to-say-so-if-that-is-what-was-meant' rule of statutory interpretation has full force here." *Commissioner of Internal Revenue v. Beck's Estate,* 129 F.2d 243, 245 (2d Cir.1942).

In all of the cases in which the government has made its convergence argument, it has relied on what has been referred to as CALEA's "exception clause." CALEA requires telecommunications carriers to ensure that their equipment is capable of providing a law enforcement agency with information to which it may be entitled under statutes relating to electronic surveillance. Section 1002(a) provides, in pertinent part:

(a) Capability requirements ... [A] telecommunications carrier shall ensure that its equipment, facilities, or services that provide a customer or subscriber with the ability to originate, terminate, or direct communications are capable of—

.    .    .    .    .

(2) expeditiously isolating and enabling the government, pursuant to a court order or other lawful authorization, to access call-identifying information that is reasonably available to the carrier—

(A) before, during, or immediately after the transmission of a wire or electronic communication (or at such later time as may be acceptable to the government); and

(B) in a manner that allows it to be associated with the communication to which it pertains,

except that, with regard to information acquired solely pursuant to the authority for pen registers and trap and trace devices (as defined in section 3127 of Title 18), such call-identifying information shall not include any information that may disclose the physical location of the subscriber (except to the extent that the location may be determined from the telephone number) [.]

47 U.S.C. § 1002(a)(emphasis added). As it has in the other cases, the government contends here that the use of the words "solely pursuant" codifies Congress's unmistakable intent to combine the Pen Statute with the SCA and authorize federal judges to issue so-called "hybrid orders" which permit the disclosure of *real time* cell location data captured by a pen register so long as the evidentiary standard that had otherwise been reserved for disclosure of *historical* cell site data under the SCA has been met.

Based on my review of the statutes, I share the concerns expressed by some of my Magistrate Judge colleagues as to the wisdom and logic of predicating Congress's intent to combine statutory provisions separately enacted over a fifteen year period to create a new and independent hybrid authorization mechanism on the use of the word "solely" in the exception clause. *See In re Application for Pen Register and Trap/Trace Device with Cell Site Location Authority,* 396 F.Supp.2d 747, 765 (S.D.Tex.2005)("The government's hybrid theory, while undeniably creative, amounts to little more than a retrospective assemblage of disparate statutory parts to achieve a desired result"); *In re Matter of the Application of the United States of America for an Order Authorizing the Release of Prospective Cell Site Information,* 2006 WL 41229, at *11 (D.D.C. Jan.6, 2006) ("I cannot predicate such a counterintuitive conclusion on the single word

'solely' "); *In the Matter of the Application of the United States of America for an Order Authorizing the Disclosure of Prospective Cell Site Information,* 2006 WL 243017, \*10 (E.D.Wis. Jan. 17, 2006)("If Congress intended to allow prospective cell site information to be obtained by means of the combined authority of the SCA and the Pen/Trap Statute, such intent is not at all apparent from the statutes themselves.").

Both assigned counsel and government counsel refer to the legislative history of CALEA and specifically then FBI Director Louis Freeh's 1994 testimony to Congress on the meaning of the exception clause. The government contends that "[t]he importance of Director Freeh's testimony cannot be overstated" because, *inter alia,* it confirmed that both he and Congress "intended for the disclosure of such [cell site] information to be governed by the rules for transactional, non-content information in Section 2703 of the SCA." *See* Government Reply Memorandum at pages 7–8. After review of the legislative history, I respectfully disagree with the government's interpretation of Director Freeh's statements. The context in which Director Freeh's statement was made is as important as its content in understanding its significance. Director Freeh's statements were made in response to what he believed were unfounded concerns expressed by "privacy-based" groups over law enforcement access to telephone "setup information." The concern expressed was whether such information could permit the tracking of cellular telephone users. In a section of his prepared remarks entitled "Allegations of 'Tracking' Persons", Director Freeh stated:

Law enforcement's requirements set forth in the proposed legislation include an ability to acquire "call setup information." This information relates to dialing type information—information generated by a caller which identifies the origin, duration, and destination of a wire or electronic communication, the telephone number or similar communication address. Such information is critical to law enforcement and, historically, has been acquired through use of pen register or trap and trace devices pursuant to court order.

Several privacy-based spokespersons have criticized the wording of the definition regarding this long-standing requirement, alleging that the government is seeking a new, pervasive, automated "tracking" capability. Such allegations are completely wrong.

Some cellular carriers do acquire information relating to the general location of a cellular telephone for call distribution analysis purposes. However, this information is not the specific type of information obtained from "true" tracking devices, which can require a warrant or court order when used to track within a private location not open to public view. *See United States v. Karo,* 468 U.S. 705, 714, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984). Even when such generalized location information, or any other type of "transactional" information, is obtained from communications service providers, court orders or subpoenas are required and are obtained.

*In order to make clear that the acquisition of such information is not being sought through the use of a pen register or trap and trace device, and is not included within the term "call setup information," we are prepared to add a concluding phrase to this definition to explicitly clarify the point: except that such information (call setup information) shall not include any information that may disclose the physical location of a mobile facility or service beyond*

*that associated with the number's area code or exchange.*

Statement of Louis J. Freeh, Director, FBI, Before the Senate Judiciary Subcomm. on Tech. and the Law and the Subcomm. on Civil and Constitutional Rights, March 18, 1994, Federal Document Clearing House, at *29 (*available at* 1994 WL 223962)(emphasis supplied). In his statement Director Freeh also assured Congress that the purpose of the proposed legislation was to "clarify and define" the responsibilities common carriers have to assist government agencies in implementing court orders authorizing the interception of "the *content* of wire and electronic communications." *Id.* at 27. Freeh stated:

> These chapters have nothing to do with "transactional information" under our federal electronic surveillance and privacy laws. *All telecommunications "transactional" information is already protected by federal law and is exclusively dealt with in Chapter 121 of Title 18 of the United States Code ("Stored Wire and Electronic Communications and Transactional Records Access") The proposed legislation does not relate to Chapter 121 of Title 18.*

*Id.* at 27–28. If, as Director Freeh explained, the proposed legislation did not relate to the SCA, it is exceedingly difficult to adopt the government's view that the exception clause specifically authorizes the Court to apply substantive provisions of the SCA in reviewing the cell site application before the Court. As Magistrate Judge Callahan recently opined:

> Simply stated, in his remarks, Director Freeh assured Congress that the legislation about which he was testifying and urging Congress to pass had nothing to do with, and did not relate to, the SCA, to wit, 18 U.S.C. § 2701, *et seq.* In the face of such testimony, it makes no

sense to me that, by the use of the word "solely" in 47 U.S.C. § 1002(a)(2), Congress was in some back-handed fashion intending to allow the SCA to be used in conjunction with the Pen/Trap Statute to obtain the very information that Director Freeh assured Congress he was not seeking the authority to obtain under the proposed legislation.

*In the Matter of the Application of the United States of America for an Order Authorizing the Disclosure of Prospective Cell Site Information,* 2006 WL 243017 at *10 (E.D.Wis. January 17, 2006). Thus, whatever "solely" means, there is nothing in the legislative history on which the government can reasonably rely to support their contention that it was specifically meant to pair the Pen Statute with the SCA to gain access to real time cell data. Even Magistrate Judge Gorenstein, upon whose comprehensive opinion the government primarily relies, found it difficult to decipher congressional intent. "While we have extracted some semantic content out of the word 'solely,' it has hardly been a satisfying exercise inasmuch as we are left with the conclusion that Congress has given a direction that cell site information may be obtained through some unexplained combination of the Pen Register Statute with some other unspecified mechanism." *In re Application of the United States of America for an Order for Disclosure of Telecommunications Records and Authorizing the Use of a Pen Register and Trap and Trace,* 2005 WL 3471754 at *6 (S.D.N.Y. Dec.20, 2005).

Last, but certainly not least, the government's own arguments at the hearing contradict its convergence theory of statutory construction. The government is convinced that Congress intended to allow prospective cell site location information to be captured as "signaling information" pursuant to the Pen Statute and then im-

mediately disclosed to law enforcement on a real time basis pursuant to the evidentiary standard set forth in section 2703(d)of the SCA. There is no question that the non-content signaling information captured by a pen register can provide much more precise location data than the "general location information" the government has applied for in the instant application. Indeed, during oral argument, government counsel conceded that in previous "hybrid" applications the government has sought prospective cell location data that could be used by law enforcement to triangulate the location of a cell phone to a degree perhaps beyond "general location information." [4] When asked what evidentiary standard should be paired with the Pen Statute when the government seeks real time cell site data that can be used to triangulate the cell phone to anything more precise than "general location information," government counsel's immediate and unequivocal response was "probable cause." When pressed whether it has formally abandoned the position that a hybrid application is appropriate for anything more than "general location information" captured by the pen register, the government's answer was commendably candid but less than legally enlightening.[5]

The government's shifting position on what standard applies pays tribute not only to the slippery constitutional slope their position involves, but also impugns the specific statutory arguments made in support of the application before the Court. While I appreciate the government's recognition that their real time processing of captured cell data could become

---

4. *See e.g., In re Application for Pen Register and Trap/Trace Device with Cell Site Location Authority,* 396 F.Supp.2d 747, 749 (S.D.Tex.2005)(relying on "hybrid authority," government sought, *inter alia,* "information regarding the strength, angle, and timing of the caller's signal measured at two or more cell sites, as well as other information such as a listing of all cell towers in the market area, switching technology, protocols, and network architecture.").

5. Q: (by the Court): The reason I'm pressing you on this is the whole point of your hybrid analysis would apply with equal force to triangulation information. You may not be wanting to exercise that, but you're telling me that even though we collect triangulation information under the cell [pen] statute and even though 2703 allows us to pair it with the pen register statute, we're not going to go and get that extra information? Why? If your argument makes sense, why doesn't it make sense for all the information you can collect?

A: (AUSA Littlefield): Well there's a couple of practical things going on. One, we're before magistrate judges that are the gatekeepers—we're trying to convince them that the government isn't being some ruthless, overbearing entity—we're trying to be reasonable. So, therefore, if we can get the magistrate's ear and we don't have to fight this fight a zillion times, we'll back off. If you have this internal radar that's going on "privacy interest, privacy interest", okay, we'll back off. But is it possible the argument could be made that we could be here on another day having gotten floor one and now we're trying to get floor two? Yes. Has that been suggested by anyone? Absolutely not.

Q: In fact, you're telling me that the word you're getting is to stop at the general location?

A: Take it one step further Judge. Remember that the signaling information is defined as before, during, and at the end. And we're taking the "during" and not taking advantage of that because we're trying to respond to the issues that have been raised by the magistrate judges and respond to the ambiguity of the statutes by taking as reasonable, common sense approach that we can. We know what we can get under ECPA. We know that ECPA allows it. There's a common sense decision that says if we want to do this higher step, if we want to go to triangulation, we're gonna have a hell of a fight, if we think we have a fight now, we'll have a heck of a fight on our hands because then we're on slippery ground, because there's no bedrock statute that says this is not a privacy concern as far as the courts are concerned in terms of a probable cause standard.

so precise that it would implicate the *constitutional* rights of the cell phone user, the challenge here is to the *statutory* justification for their application.

The foundation of the government's hybrid argument is that Congress specifically intended to allow law enforcement real time access to *all* non-content signaling data by directing judges to pair the capturing authority found in the Pen Register statute with the less than probable cause standard found in section 2703(d) of the SCA. *See In the Matter of an Application of the United States for an Order (1) Authorizing the Use of a Pen Register and a Trap and Trace Device and (2) Authorizing Release of Subscriber Information and/or Cell Site Information,* 396 F.Supp.2d 294, 316 (E.D.N.Y.2005)("[T]he essence of the hybrid theory is that the two statutes together accomplish what neither can alone"). The government's *statutory* rationale, however, is not dependent on whether the data captured is obtained from one cell tower or three cell towers. It is not dependent on whether the government obtains real time cell site data before, during, or after a cellular phone call. If the government is correct and Congress intended that judges pair the Pen Statute with the SCA to obtain real time cell data, there certainly is nothing in the statute to suggest it limited that authority to certain types of cell site data or only data which the government decides is "general location information." Moreover, there is nothing in the legislative history of CALEA to suggest that the exception clause was intended by Congress to create some sort of sliding scale pairing mechanism, with the evidentiary standard for ordering disclosure hinging on the type or duration

of pen register data or signaling information sought by law enforcement. Indeed, if, as the government now contends, anything more than the nominal location information sought in the instant application is governed by the probable cause standard, why would Congress not have recognized the same concern and intended that the Pen Statute be paired with Rule 41 of the Federal Rules of Criminal Procedure?

During the hearing, the government stated that it was trying to address the legal issues raised by magistrate judges and "respond to the ambiguity of the statutes" at issue here. The government's concerns over the "ambiguity of the statutes" are well founded, but it is the Congress and not the Department of Justice who is empowered to respond to those concerns.[6]

### *Conclusion*

The Court does not agree with the government that it should impute to Congress the intent to "converge" the provisions of the Pen Statute, the SCA and CALEA to create a vehicle for disclosure of prospective cell location information on a real time basis on less than probable cause. The Court will, however, issue a warrant for the seizure of the requested real time cell location information upon a showing that there exists probable cause to believe that the data sought will yield evidence of a crime.[7]

**SO ORDERED.**

6. The Court is aware of a bill recently introduced in the Senate, which would "clarify the legal standard needed to use cellular tele-

phones as tracking devices." *See* S.2130, 109th Congress (2005).

7. In its Reply Memorandum (Docket # 6), the government proffered that additional research

revealed "an alternative theory upon which relief could be granted under the All Writs Act." *Id.* at 1–2. For the reasons stated by Magistrate Judge Orenstein in his thorough discussion of why the All Writs Act does not empower the judiciary to authorize investigative techniques denied law enforcement by the legislative branch of government, I decline to endorse the government's "alternative theory." *See In the Matter of an Application of the United States for an Order (1) Authorizing the Use of a Pen Register and a Trap and Trace Device and (2) Authorizing Release of Subscriber Information and/or Cell Site Information,* 396 F.Supp.2d at 325–326.